**Theresa GELLERMAN, Plaintiff,**

v.

**JEFFERSON PILOT FINANCIAL INSURANCE COMPANY and Miller/Zell, Inc. (ISO Holdings, Inc.) Long Term Disability Plan Defendants**

No. H–04–3483.

United States District Court, S.D. Texas, Houston Division.

June 28, 2005.

Blair Bernard Brininger, III, Attorney at Law, Houston, TX, for Plaintiff.

Charles Tynan Buthod, Baker & Botts LLP, Houston, TX, for Defendants.

## MEMORANDUM OPINION
## AND ORDER

HOYT, District Judge.

## I. INTRODUCTION

Pending before this Court are cross motions for summary judgment. The suit revolves around the denial of long-term disability benefits to Theresa Gellerman, the plaintiff in this suit. The defendants, Jefferson Pilot Financial Insurance Company ("Jefferson Pilot") and Miller/Zell, Inc. (ISO Holdings, Inc.) Long Term Disability Plan (the "Plan"), terminated the plaintiff's long-term disability benefits under the Plan after determining that the plaintiff was able to perform her previous job as a creative art director. The plaintiff unsuccessfully pursued all appropriate administrative avenues and then filed this suit on September 3, 2004, pursuant to 29 U.S.C. § 1132(a)(1)(B).

After considering the motions, responses, the pleadings, and the applicable law, this Court determines that the defendants' motion should be DENIED and that the plaintiff's motion should be GRANTED.

## II. FACTUAL BACKGROUND

### A. The Plan

The Plan is a group long-term disability insurance policy governed by the Employee Retirement Income Security Act of 1947 ("ERISA"). Jefferson Pilot is the insurer of the Plan and also serves as the Plan fiduciary with the responsibility for evaluating claims. Further, Jefferson Pilot exercises discretionary authority to interpret the terms of the Plan and determine entitlement to Plan benefits.

The plaintiff's claim is for a total disability, and the Plan establishes two distinct periods when a disability is recognized, i.e., during the Elimination and Own Occupation periods and after the Own Occupation Period. Under the former, total disability exists when, "due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation." After the Own Occupation Period, a disability exists when "due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow."

The "Elimination Period" refers to a period lasting between 90 and 180 days beginning on the first day of disability. It represents "a number of days of Disability during which no benefit is payable." The elimination period is satisfied when 90 days of disability is experienced within a 180-day period. The "Own Occupation Period" refers to "a period beginning at the end of the Elimination Period and ending 24 months later."

After the elimination period expires, Jefferson Pilot will continue to pay disability benefits to an insured employee if she: 1) is totally disabled as defined by the Plan; 2) is under the regular care of a physician; and 3) submits proof of continued total disability and physician's care upon request.

### B. The Plaintiff

Theresa Gellerman is a 49 year-old female who suffers from prolonged and complicated spinal problems. While her back problems existed well before 1998, it was then that the plaintiff's pain eventually led her to have surgery to fuse the 9th, 10th, 11th, and 12th thoracic vertebrae.[1] Relief

---

1. The vertebrae are divided into three main regions: the cervical vertebrae (the seven upper vertebrae in the neck region), the thoracic vertebrae (the twelve middle vertebrae), and the lumbar vertebrae (the five vertebrae in the lowest part of the back). Following the lumbar vertebrae is the sacrum, the lowest vertebral bone that connects to the pelvis. In

after the 1998 surgery was minimal and short-lived, and Gellerman's pain in her thoracic region began to increase with time. This pain, in addition to an onset of pain in the lumbar and cervical regions and numbness in her extremities, led the plaintiff to see Dr. Kozak on June 5, 2000. Unfortunately, sometime in early July of that year, the plaintiff experienced a light fall that exacerbated her already problematic back problems, resulting in increased back pain and numbness in her extremities. An MRI revealed injured and bulging L4/L5 and L5/S1 discs [2] and a grade one spondylolisthesis [3] in the L5 vertebra.

Doctor Kozak referred the plaintiff to a pain management doctor, but despite the pain management care, the pain continued to increase. Eventually, Dr. Kozak ordered the plaintiff to discontinue working effective November 24, 2000, and scheduled surgery of the lumbar spine for January 23, 2001.

Meanwhile, the plaintiff made her initial claim for benefits under the Plan on December 12, 2000, and the defendants began paying benefits on February 23, 2001.[4] After the January 23 surgery, the plaintiff's lower back showed some improvement, though the pains throughout her back continued to require strong pain medications such as Oxycontin and Methadone. Her pain management doctors also referred her to Dr. Smith, a clinical psychologist specializing in treating patients suffering from chronic pain. The plaintiff began meeting with Dr. Smith on September 22, 2001, to discuss her chronic pain issues.

During the latter half of 2001, the defendants, pursuant to their policy rights, requested updates concerning the plaintiff's medical condition. That summer, Jefferson Pilot requested that the plaintiff complete an "Insured Supplementary Statement" and required her attending physician to provide a "Medical Support Statement." The plaintiff and Dr. Kozak provided the appropriate statements, both of which indicated that the plaintiff was still unable to work. In October of 2001, a consultant of Jefferson Pilot, nurse Judy Guinan, referred the plaintiff to the Healthsouth medical facility ("Healthsouth") for a Functional Capacity Examination ("FCE") to help gauge her ability to work. The results of the FCE are significant because the defendants rely heavily on the FCE in evaluating whether to continue benefits.

medical nomenclature, the vertebrae are referred to by an abbreviation of the region ("C" for cervical, "T" for thoracic, "L" for lumbar, and "S" for sacrum) followed by a number representing the particular vertebral bone. The numbers start at one for the upper-most bone in the region, and number consecutively downward for that region. Thus, the upper-most cervical, thoracic, and lumbar bones are the C1, T1, and L1 vertebrae, respectively, and the lower-most cervical, thoracic, and lumbar bones are the C7, T12, and L5 vertebrae, respectively.

2. Discs are the cushiony material located between adjacent vertebrae and are referred to by the short-hand name of vertebrae they are between. For example, the disc between the L4 and L5 vertebrae is referred to as the L4/L5 disc. When a disc bulges or ruptures, it may press on nerves surrounding the disc, causing pain in the terminal location of the nerve.

3. The term spondylolisthesis refers to the situation where a vertebra has fractured and is unable to maintain its proper position in the spinal column.

4. February 23, 2001 represents the first date that the Plan was contractually obligated to begin disability payments, because the plaintiff stated that her disability began on November 27, 2000, and the Plan calls for a 90-day elimination period during which no benefits are paid.

A licensed physical therapist with Healthsouth conducted the original FCE on October 24, 2001. Because no formal job description had been made available, Healthsouth relied on an oral job description provided by the plaintiff. In the "Results" section of the FCE, the evaluator concluded, "[Gellerman] did not meet the positional tolerance requirements of her previous job as a creative art director." The results also stated that, "Gellerman demonstrated the ability to function in a 'sedentary' type of occupation/category (according to the D.O.T.) for 8 hours per day . . . ."[5]

In early January 2002, an individual from Jefferson Pilot contacted the evaluator at Healthsouth to see if he would be willing to make an addendum to the October FCE if Healthsouth received a formal description of the plaintiff's old job. Jefferson Pilot faxed the formal job description to Healthsouth, and the evaluator created an addendum to the FCE. The addendum, dated January 14, 2002, first summarizes the formal job description as "Standing and walking on occasional basis. Sitting requirements is on frequent level.[6] Lifting and carrying is limited to 15 up to 20 lbs. The job can be performed by alternating sitting and standing." The evaluator concluded, however, that the plaintiff's functional capacity "did not parallel the job requirement." He went on to explain that although the job specified sitting at a "frequent" level, Gellerman "was

only able to sit on an 'occasional' basis (15 minutes at the most)." Finally, he offered his opinion that

> [Gellerman] might be able to perform modified job activities if she is given a lifting restriction of 15 lbs.[7] and restricting sitting activities for no more than 15 minutes at a time. She should be allowed to change and shift position alternating between sitting, standing, [and] walking around during her work periods.

### C. The Precipitating Events

On January 23, 2002, Jefferson Pilot notified the plaintiff that long-term disability benefits would no longer be paid. The defendants' letter cited the October FCE as its basis for denial of benefits, stating that the FCE demonstrates that the plaintiff is "capable of performing within the sedentary physical capacity with [sic] as long as [she] has the ability to change position frequently." The defendants' letter also asserts that "the only lifting requirement would be the use of a lap top computer and that would not generally exceed 10 pounds."

Shortly thereafter, on March 5, 2002, the Social Security Administration ("SSA") determined that the plaintiff had a disability beginning November 24, 2000. The SSA's defines disabled to mean that an individual cannot engage in *any* gainful employment for which she is qualified (as opposed to

---

5. A "sedentary" job is one that requires "Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."

*Dictionary of Occupational Titles,* Appendix C, as printed on http://www.occupationalinfo.org/appendxc_1.html.

6. The terms "occasional" and "frequent" are terms of art. Occasionally means the (activity exists from 0% to 33% of the total work time), and frequently means the activity exists from 33% to 66% of the time.

7. The job description called for lifting of 15–20 lbs.

the Plan's relevant definition, which states that the plaintiff is unable to perform her actual previous job).

On July 1, 2002, the plaintiff appealed the denial of benefits. The appeal included several documents, including the notice of award of social security disability benefits, records from Dr. Seifert (the pain management doctor), Dr. Smith (the psychologist), and Dr. Kozak (her primary back doctor). The appeal further highlights that the FCE to which the defendants cited concluded that the plaintiff did not meet the positional requirements of her previous job. On August 23, 2002, the defendants rejected the appeal, again citing the FCE and noting that the Plan does not consider the individual requirements of the plaintiff's previous job, but rather the general requirements of that job description as would be expected in the general population. The plaintiff filed her second appeal in February 2003, which was rejected on May 27, 2003.[8] The plaintiff filed the instant suit on September 3, 2004.

## III. CONTENTIONS OF THE PARTIES

The plaintiff contends that she is disabled under the Plan's Own Occupation period, and that the defendants owe her long-term disability benefits for the period of January 23, 2002, to February 23, 2003. She asserts that the termination of benefits represents an abuse of discretion because the defendants misinterpreted both the FCE and the job description.

The defendants maintain that they acted within their discretion in terminating the plaintiff's benefits because, as they read the FCE and job description, the plaintiff could have performed her previous job. They assert that her previous job would have allowed her to alternate between sitting and standing and would have required lifting no more than 10 pounds. Further, they contend that the plaintiff's doctors' notes and tests indicate that she is not disabled.

## IV. STATEMENT OF THE LAW

### A. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to ... judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings" and designate "specific facts" in the record "showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. Throughout the analysis, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See id.* at 247–49, 106 S.Ct. 2505. A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and

---

**8.** During and after the administrative appeal period, Gellerman continued to experience pain and numbness. She also continued to meet with various doctors, none of whom suggested that she could return to work. The defendants offer no contradictory medical evidence to the doctors' notes.

mandates a finding that no genuine issue of fact exists. *See Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991).

## B. Denial of Benefits Under an ERISA Policy

■ Under ERISA, a beneficiary may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Courts review the denial of ERISA benefits under an ERISA policy for "abuse of discretion" if the policy grants the administrator or fiduciary final and conclusive discretionary authority. *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). Furthermore, a factual determination, such as whether a beneficiary is totally disabled under the terms of a plan, always warrants an "abuse of discretion" review. *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828–29 (5th Cir. 1996).

■ In the ERISA context, the "abuse of discretion" standard is synonymous with an "arbitrary and capricious" standard. *Meditrust*, 168 F.3d at 213. A decision is arbitrary and capricious if it is "made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* at 215 (quoting *Bellaire Gen. Hosp.*, 97 F.3d at 828–29). When an administrator terminates disability benefits, the law requires that substantial evidence support the decision. *Id.; Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir.2004). In general, the only evidence a district court may consider when reviewing a denial of benefits is the evidence made available for fair review to the administrator before the lawsuit was filed.

*Vega v. Nat'l. Life Ins. Servs., Inc.*, 188 F.3d 287, 300 (5th Cir.1999).

■ Usually, the application of the abuse of discretion standard is a two-step process, wherein a court first determines the legally correct interpretation of the Plan and second, if the administrator did not apply the legally correct interpretation, determines whether the administrator's actions constituted an abuse of discretion. *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir.1992). However, in cases not involving sophisticated Plan interpretation issues, "the reviewing court is not rigidly confined to this two-step analysis." *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 n.3 (5th Cir.1994).

■ Deference to the abuse of discretion standard of review can be modified downward on a "sliding scale" when a beneficiary demonstrates that the plan fiduciary has a conflict of interest. *Vega*, 188 F.3d at 297. The more that the evidence indicates a conflict of interest on the part of the fiduciary, the more a court will abrogate its deference. *Id.* Importantly, a demonstrated conflict of interest does not change the abuse of discretion standard, but rather represents a factor weighing against the administrator's decision. *Id.* at 299.

## C. Demonstrating Conflicts of Interest

■ One way a potential conflict of interest arises is when, as in this case, a company contracts with a third party that both insures and administers the plan. *See Vega*, 188 F.3d at 295 (stating that, in such a situation, "the administrator potentially benefits from every denied claim."). However, this Court has struggled somewhat to discern the minimum basis for demonstrating a conflict of interest. While the *Vega* en banc panel seemed to make clear that a third party insurer who also serves as the plan administrator rep-

resents "the minimal basis for a conflict," 188 F.3d at 301, a recent Fifth Circuit decision, *Ellis v. Liberty Life Assur. Co. of Boston,* 394 F.3d 262 (5th Cir.2004), called this straightforward analysis into question.

*Vega* involved an insurer who utilized a wholly-owned subsidiary as the administrator. 188 F.3d at 301. The court, drawing an analogy to the law of trusts, treated the parent and the subsidiary more like a single entity than not, and concluded that the decision to deny benefits "was, to some degree, self-interested." *Id.* Nevertheless, the court declined to attach a strong presumption of self-interest on the part of an insurer/administrator, noting that the "reputational and contractual losses" to an insurer who consistently denies valid claims should not be ignored. *Id.* at 295 n. 8. The *Vega* court concluded by stating,

> Although the [plaintiffs] have demonstrated the *minimal basis* for a conflict, they have presented *no evidence* with respect to the degree of the conflict. On our sliding scale, therefore, we conclude that it is appropriate to review the administrator's decision with only a modicum less deference than we otherwise would.

*Id.* at 301 (emphasis added).

The implication of the *Vega* decision is that, in the situation where a third party insures and administers a plan and there is "*no evidence* of the degree of the conflict," there exists an apparent minimum conflict of interest. Several subsequent cases seem to follow this *ipso facto* reasoning. *See Gooden v. Provident Life & Acc. Ins. Co.,* 250 F.3d 329, 333 (5th Cir.2001) ("Our analysis is informed by [the defendant's] role as both the insurer and administrator of [the plaintiff's] long term disability plan. As such, [the defendant] operates under a conflict of interest because it 'potentially benefits from every denied claim.' "); *Lain v. UNUM Life Ins. Co. of Am.,* 279 F.3d 337, 343 (5th Cir.2002) ("When a minimal

basis for a conflict is established, we review the decision with 'only a modicum less deference than we otherwise would.' "); *MacLachlan v. ExxonMobil Corp.,* 350 F.3d 472, 479 n. 8 (5th Cir.2003) (drawing a distinction between the situation where a company interprets and administers its own plan on behalf of its employees—a situation that does not itself suffice to create an inherent conflict of interest—and the situation where an insurer and administrator is a third party who is "contractually obligated to make payments under the employer's plan"—a situation that allows finding an apparent conflict of interest).

However, in 2004 the *Ellis* court split 2–1 in part on the role of presumptions about conflicts of interest. *Ellis* involved a defendant insurance company who acted as both the insurer and the administrator in charge of determining benefits eligibility for Chase Manhattan Bank's employee policy. 394 F.3d at 266–67. In a footnote, the court states, in dicta, "[u]nlike the dissent, we will not read into *Vega* a presumption that a conflict exists *ipso facto* merely because the plan fiduciary both insures the plan and administers it." *Id.* at 270 n. 18. This statement seems to contradict the syllogism-like reasoning of previous decisions. *See, e.g., Gooden,* 250 F.3d at 333. Notwithstanding its footnote 18, the majority opinion found that a conflict of interest existed because the defendant "acknowledge[d] that it has a financial interest in the dollar value of the claims that are paid under the policy." *Id.* at 270. This Court finds the statement perplexing because a third party entity playing the dual role of insurer and administrator will always have a financial interest in the dollar value of paid claims. Hence, in an effort to read *Vega, Gooden, MacLachlan,* and *Ellis* in congruity, the Court assumes that footnote 18 in the *Ellis* opinion alludes to a situation where the

insurer/administrator may also be the employer of the beneficiary.

■ This Court is bound to follow the most recent Fifth Circuit panel decision, and "the rule of orderliness forbids one of our panels from overruling a prior panel." *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir.1999). Thus, this Court operates under the impression that *Ellis* and *Gooden* are not in opposition. As a result, this Court presumes that a minimal conflict exists when the plan fiduciary is a third party that both insures and administers the plan.

## V. APPLICATION OF THE LAW

### A. Abuse of Discretion

■ The Plan grants Jefferson Pilot discretionary authority to administer claims, to interpret policy provisions, and to resolve questions arising under this policy. As a result, this Court reviews the defendants' plan interpretations and factual determinations under an abuse of discretion standard, searching for any substantial evidence supporting the decision to deny further benefits. *See Meditrust*, 168 F.3d at 213–15. Substantial evidence has been described as "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 273 (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)).

■ In this case, the defendants' decision to terminate benefits represents an abuse of discretion. The decision is based primarily on the FCE performed by Healthsouth and the job description provided by the plaintiff's previous employer. As outlined in the statement of facts above, the FCE evaluator concluded that the plaintiff could only sit on an "occasional" basis (0–33% of the time) and could not lift more than 15 pounds on an "occasion-

al" basis. Furthermore, the evaluator clearly stated, both in his original report and in the addendum, that the plaintiff could not perform her previous job. Nevertheless, the defendants ignore these statements and instead attempt to patch together bits and pieces of the evaluation and job description to support a denial of benefits.

First, the defendants rely on the evaluator's statement that the plaintiff can perform "a 'sedentary' type of occupation/category (according to the D.O.T.)." The defendants then submit that the D.O.T. defines a creative art director position as a "sedentary" occupation and argue that the plaintiff must therefore be able to perform her previous job. What the defendants ignore is the word "type" in the evaluator's statement that the plaintiff can perform "a sedentary type of occupation." The word proves crucial because it highlights the fact that "sedentary" occupations represent a range of occupations starting at the least strenuous end of the D.O.T. job spectrum. Thus, the evaluator's statement can only mean that the plaintiff is confined to some subset of jobs within the sedentary category. This conclusion is bolstered by the fact that the FCE addendum limits the plaintiff's on the job sitting to the "occasional" level, while the D.O.T. defines sedentary jobs to permit sitting up to the "frequent" duration. Even ignoring the D.O.T., the FCE upon which the defendants rely unambiguously limits the plaintiff's sitting to the occasional level, while admitting that her previous job required sitting on a "frequent" basis.

The defendants attempt to circumvent this conclusion by relying on a checked box on the job description form indicating that the defendant could perform her job by alternating between sitting and standing. The evaluator's notes on the FCE indicate

that he was aware of the ability to alternate between sitting and standing, but he, nevertheless, made clear that the plaintiff could not tolerate sitting at a "frequent" level, regardless of whether she could stand for some intervals. An administrator is not allowed to pick and choose evidence on which to rely as it did in this case. This manner of handling the evidence amounts to an abuse of discretion because the defendants ignored key statements and conclusions in the FCE.[9] *See Collinsworth v. Hartford Life and Acc. Ins. Co.*, 2005 WL 1189841 (N.D.Tex.2005) (slip copy); *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir.2002) (concluding that the administrator "cherry-picked" files in order to obtain a favorable report).

The defendants also abuse their discretion by ignoring the 20–pound lifting requirement listed on the formal job description. In its termination of benefits letter, Jefferson Pilot simply disregards this requirement, instead surprisingly concluding that the plaintiff could perform her job because "[t]he only lifting requirement would be the use of a lap top computer and that would not generally exceed 10 pounds." The defendants cite no source for their assertion that the lifting requirement is limited to 10 pounds, and the Court can find no documentation supporting this number. Perhaps coincidentally, 10 pounds is the upper weight limit that the D.O.T. lists for sedentary work.

Regardless, the job description clearly states that the required lifting range is 15–20 pounds, and the defendants abused their discretion by failing to account for

the requirement. Although the FCE evaluator opined that the plaintiff *might* be able to perform her old job *if* she was given a lifting restriction of 15 pounds, such hypotheticals are of no consequence when the job description indicates that the employer cannot make changes to accommodate the employee. *See Mhadbhi v. Jefferson Pilot Fin.*, 255 F.Supp.2d 1109, 1115 (N.D.Cal.2003) (holding that a doctor's opinion that the plaintiff could perform his job *if* the requirements could be modified contained a "glaring gap" because "there is no evidence in the record that plaintiff's job allows for the satisfaction of this condition").

The overwhelming evidence indicates that the plaintiff was disabled from her previous job. Moreover, the defendants point to no evidence contradicting the conclusions of the plaintiff's doctors or the FCE evaluator. Hence, the defendants' decision to terminate disability benefits during the Own Occupation Period constituted an abuse of discretion.

### B. *Other Considerations*

 Even though this Court is of the opinion that the defendants' decision to terminate disability benefits represents an abuse of discretion giving full deference to the defendants, the Court notes that several additional factors weigh against the defendants' decision. The first factor is the conflict of interest that the defendants maintain as a result of their role as a third party insurer and administrator. *See Vega*, 188 F.3d at 301. However, because the plaintiff has presented no evidence re-

---

**9.** The defendants also selectively quote the statements of Gellerman's doctors regarding her health after her lumbar surgery. Although the lumbar region of her back improved structurally after surgery, she continued to experience pain in numbness in multiple locations of her back and extremities. The defendants are not free to ignore

the plaintiff's chronic and severe pain under the apparent theory that MRIs or EMGs must demonstrate some structural deformity for a person to be disabled because of back pain. Unfortunately for all parties involved, back pain, even severe pain, is not so simple.

garding the extent of the conflict, this factor calls for a review "with only a modicum less deference." *Id.*

A second factor weighing against the reasonableness of the defendants' decision is the determination by the Social Security Administration ("SSA") that the plaintiff was disabled. Although the SSA's determination did not occur until after the defendants initially denied benefits, the plaintiff included the information in her appeal. Further, while the Plan does not require the administrator to consider a determination of the SSA, neither does it forbid such consideration.

■■■ This Court agrees with the defendants that the SSA determination is not binding on a plan administrator. *Schaffer v. Benefit Plan of Exxon Corp.*, 151 F.Supp.2d 799 (S.D.Tex.2001). However, no court has held that an SSA determination is completely irrelevant. The Court is likewise aware of the differences between the SSA and private benefit plans as outlined in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), but finds nothing in the opinion suggesting that an SSA determination is of no value in assessing the reasonableness of an administrator's terminations of benefits.

■■■ Furthermore, the defendants were aware of the SSA determination: they contracted with a third party to advocate the plaintiff's cause before the SSA, and, upon the SSA award of benefits, immediately requested overpayment refunds from the plaintiff.[10] Particularly in this case, where the Plan's definition of disability is limited to the plaintiff's duties at her former job (as opposed to the broader SSA definition of any job for which she is qualified), an administrator should give extra

pause before terminating disability benefits. *See Bell v. Am. Elec. Power Sys. Long–Term Disability Plan*, No. Civ. A.1:04CV073–C, 2005 WL 646044, *5 (N.D.Tex. March 21, 2005) (slip copy) (stating that, although the SSA's disability determination may not be conclusive, it "is relevant to the plan administrator's determination of disability").

To be clear, this Court does not consider the SSA's determination binding, nor need it weigh significantly against the defendant's decision. However, under the facts of this case, the Court regards it as a relevant factor that should lessen, even if slightly, the deference due to the defendants' decision.

■■■ A final factor weighing against the reasonableness of the defendants' decision is their use of nurses, as opposed to medical doctors, to review and make final recommendations on disability claims. While an administrator need not employ specialist physicians to review claims, *Sweatman v. Comm. Union Ins. Co.*, 39 F.3d 594 (5th Cir.1994), the level of deference due nurses should generally be less than that extended to doctors whose professions concentrate in the relevant field. That is not to say that an administrator automatically abuses its discretion if it relies on a nurse, but rather that when an administrator relies on nurses to override highly trained physicians, the court should decrease the level of deference afforded the administrator. Research reveals no published case directly on point, but indicates that other courts, at least in the context of determining medical necessity, have been wary of giving nurses broad deference. *See C.N.S., Inc. v. Conn. Gen. Life Ins. Co.*, 9 F.Supp.2d 194, 198 (E.D.N.Y.1998); *Pritt*

---

10. The Plan provides that monthly benefits will be reduced by income from other benefit, including those from the SSA. Because the SSA awarded its benefits retroactively start-

ing from November 2000, the defendants had a contractual right to repayment in the amount of the retroactive SSA benefits.

*v. United Mine Workers of Am.,* 847 F.Supp. 427 (S.D.W.Va.1994).

## VI. CONCLUSION

For the reasons stated, the Court finds that the defendants' motion should be and is DENIED and that the plaintiff's motion should be and is GRANTED. The plaintiff shall recover disability benefits from January 23, 2002, through February 23, 2003, pursuant to the Plan, less any overpayment refund relating to the award of social security benefits. Awards and refunds shall be paid with prejudgment and post-judgment interest at a rate of 6% annually.

The plaintiff shall recover attorney's fees, and the plaintiff has 10 days from the entry of this memorandum to file an appropriate request. The defendants shall have five days after the filing of the plaintiff's request to submit a reply challenging the amount of the request.

It is so ORDERED.