Bridget ADAMS

v.

**METROPOLITAN LIFE INSURANCE COMPANY, et al.**

Civil Action No. 06–301–JJB–DLD.

United States District Court,
M.D. Louisiana.

May 21, 2007.

June E. Denlinger, Baton Rouge, LA, for Bridget Adams.

Virginia N. Roddy, Jennifer M. Lawrence, Leslie N. Ladner, Preaus Roddy & Associates, L.L.C., New Orleans, LA, for Metropolitan Life Insurance Company.

## RULING AND ORDER

JAMES J. BRADY, District Judge.

This matter has been submitted to the court for a Trial on the Briefs. The parties have agreed to try this action in this manner.[1] The parties have filed a stipulated administrative record[2] and have submitted their briefs into the record in this case.[3]

A trial on the briefs is treated as a bench trial rather than a motion for summary judgment and is therefore governed by Federal Rule of Civil Procedure 52(a). *See Davis Oil Co. v. Mills*, 873 F.2d 774, 777 (5th Cir.1989); *St. Tammany Parish Tax Collector v. Barnesandnoble.com*, 481 F.Supp.2d 575, 576–77 (E.D.La.2007). Pursuant to Fed.R.Civ.P. 52(a) this ruling constitutes the court's findings of fact and conclusions of law.

### I. Findings of Fact

**A. The Plaintiff and Her Claims**

The plaintiff, Bridget Adams is a former employee of Dow Chemical Company ("Dow"). (R. 270).[4] Prior to working at Dow, the plaintiff was a cosmetologist. (R. 183). She is 48 years old and has a high-school diploma. (R. 270, 183). The plaintiff began working with Dow in 1990 and was employed as an Operations Specialist. (R. 270, 272).

Dow created an Employee Benefits Plan and defendant, Metropolitan Life Insurance Company ("MetLife"), was a claim administrator. The plan provided long term disability insurance. The plaintiff alleges that she is disabled "because of severe vascular headaches which cause excruciating pain that may last for several days." The plaintiff contends that:

During these headaches, she is sensitive to light and noise, experiences nausea, develops muscle spasms and often can do nothing other than staying in bed. After the headaches she is weak, achy, and fatigued for days. She also suffers from anxiety, stress and panic attacks. The symptoms are so severe that she must have assistance from family and friends to do even the basic household tasks.

[She] also suffers from multi-level degenerative disk disease of her cervical spine, a bulging disk in the cervical spine, carpel tunnel syndrome, and degenerative changes and tendonitis to the shoulder. These conditions cause decreased range of motion, stiffness, weakness and radiating pain to her neck, arm and fingers, particularly in her dominant right side.[5]

The plaintiff received long term disability benefits from March 2003 through March 2005.[6] The plaintiff brought suit against Dow and Metropolitan Life Insurance Company after a March 4, 2005 determination that the plaintiff no longer met the qualifications for being "disabled" under the policy. The plaintiff contends that "these denials were arbitrary and capricious, not supported by or consistent with the evidence presented, and a breach of the Plan terms."[7] The parties stipulated to the dismissal of The Dow Chemical

---

1. Doc. 12 (Unopposed Motion to Vacate October 12, 2006 Order and to Set Briefing Schedule and Incorporated Memorandum in Support).

2. Doc. 15.

3. Doc. 17 (Plaintiff's Trial Brief); Doc. 20 (Defendant's Trial Brief); and Doc. 21 (Plaintiff's Reply).

4. Unless noted, all citations to the record are to the file maintained in connection with Plaintiff's claim for disability benefits (doc. 15, bates numbered pages M 001–M 272).

5. Doc. 1 (Complaint, ¶ 11–12).

6. Doc. 1 (Complaint, ¶ 15).

7. Doc. 1 (Complaint, ¶ 21).

Company and an order dismissing the plaintiff's claims against Dow with prejudice was entered by the Court.[8]

## B. The Policy

The Plan had two phases of eligibility for its Long Term Disability ("LTD") benefits. Phase I LTD (the Primary Benefit Period) is the 24 month period after the initial six month Waiting Period[9] and Phase II LTD (the Second Benefit Period) starts the day after Phase I LTD ends. Each phase had its own definition of "disability." Under the plan, "disability" is defined as follows:

Phase I: You cannot, because of a sickness or an injury, perform your regular job or any other reasonably appropriate job your Employer can provide. Phase I is the same as "Full Disability" described in the Certificate of Insurance. Phase II: You cannot, because of sickness or an injury:

a. do your job; and

b. do any other job for which you are reasonably fit by your education, your training or your experience (including work with a Participating Employer, self-employment or work with another employer.

Phase II is the same as "Total Disability" described in the Certificate of Insurance.[10]

8. Doc. 18 (Stipulation of Dismissal with Prejudice) and Doc. 19 (Order of Dismissal).

9. Doc. 15 (Summary Plan Description for: The Dow Chemical Company Long Term Disability Income Protection Plan, p. 6). In order to receive LTD benefits, a claimant must first "have been totally and continuously disabled for more than six months and meet the Phase I Disability definition. The six month period is called the 'Waiting Period.'"

10. Doc. 15 (Summary Plan Description, p. 7).

11. See also R. 209 (Note dated May 7, 2002 from Dr. Falgoust stating that the plaintiff is

## C. The Plaintiff's Medical Condition

### 1. Dr. Gerard Falgoust—Primary Treating Physician

The plaintiff has sought treatment from Dr. Gerard Falgoust since August 1994. (R. 267). In May 2002, Dr. Falgoust concluded that the plaintiff suffered from severe migraine headaches and photophobia that made it unsafe for her to climb, work at heights, or be in an environment where she was stressed or exposed to sunlight. Dr. Falgoust concluded that the plaintiff could not return to her work at Dow or any other occupation. (R. 268).[11]

The plaintiff had several visits to Dr. Falgoust in May 2002. On May 7, 2002, Dr. Falgoust concluded that the plaintiff suffered from daily severe migraines that would prevent her from working. (R. 190, 223, 234). On May 30, 2002, Dr. Falgoust noted disabling headaches and photophobia. (R. 191, 222, 233).

On July 31, 2002 the plaintiff was seen again by Dr. Falgoust and he documented her "continued severe disabling" headaches. (R. 193, 221, 232). On that same date, Dr. Falgoust wrote to Dr. Gruwell informing him that the plaintiff remained "completely & totally disabled" due to her headaches. (R. 211).

Dr. Falgoust saw the plaintiff again on November 27, 2002;[12] he described the

"permanently disabled from further employment" due to her chronic vascular headaches).

12. The plaintiff asserts that this visit was on January 27, 2000 (doc. 17, Plaintiff's Trial Brief, p. 4). Concededly, the date is not perfectly legible but it appears to be November 27, 2002. The document also notes that the plaintiff's age at the time of the visit was 44. As the plaintiff's date of birth is September 8, 1958, her age at the time (44) is consistent with the visit date of November 27, 2002.

plaintiff as having daily headaches that worsen throughout the day. (R. 186). He noted that the drug Zomig provided the plaintiff with relief but left her weak. Dr. Falgoust concluded that the plaintiff's headaches were chronic, daily, disabling, and daylong. (R. 186).

The plaintiff visited Dr. Falgoust several times in 2003. (R. 131, 132).[13] Each time Dr. Falgoust concluded that the plaintiff was suffering from headaches. On a May 27, 2003 visit Dr. Falgoust noted that in addition to the plaintiff's chronic headaches, the plaintiff had Degenerative Disk Disease at C5–C6 and arm and shoulder pain. (R. 116, 133).

In response to a July 2003 request from MetLife for information about the plaintiff, Dr. Falgoust wrote that the plaintiff's headaches were unilateral or bilateral and were an 8–9 level of intensity on a scale of 10. Dr. Falgoust found that the headaches were worsened by activity, sunlight, or loud noises. He noted that the headaches occurred daily and were daylong. Dr. Falgoust also listed the drugs that had been prescribed to the plaintiff. Some of the drugs were ineffective, others provided only partial relief. (R. 129–130).

On a January 7, 2004 office visit, Dr. Falgoust described the plaintiff as suffering from anxiety attacks, stress attacks, and weight loss in addition to chronic migraine headaches. The plaintiff was also sent to an orthopedist for tendonitis. (R. 66). The plaintiff visited Dr. Falgoust again on April 2, 2004. On this occasion he found that the plaintiff continued to suffer from severe disabling headaches as well as Degenerative Disk Disease to her cervical spine. (R. 99).

On May 13, 2004 Dr. Falgoust wrote to MetLife informing the company that in his opinion, the plaintiff's headaches were "completely disabling, requiring bed rest and occasional narcotic analgesia." Dr. Falgoust found that the plaintiff was "unemployable" and "completely disabled for her current job." (R. 81). Dr. Falgoust also completed MetLife's "Attending Physician Statement of Functional Capacity" dated June 4, 2004. (R. 82–83, 68, 70). In the Physician's Statement, he noted that the plaintiff's severe daily headaches were worsened by noise, heat, light, or stress and were only temporarily relieved by medication. Dr. Falgoust concluded that the plaintiff was totally disabled from her work at Dow or any other occupation and that she could never resume work activities. (R. 83).

The plaintiff visited Dr. Falgoust's office on June 24, 2004. Dr. Falgoust documented that the plaintiff complained of severe continuous pain. (R. 72). According to Dr. Falgoust's summary, he "ordered MRI's which confirmed arthritis and tendonitis of the shoulder, and C-spine DDD with neuroforaminal narrowing consistent with nerve root impingement." (R. 57).

On March 22, 2005 Dr. Falgoust wrote to MetLife. He stated that in his opinion the plaintiff "is totally and permanently disabled for any occupation." (R. 58).[14]

### 2. Dr. Dennis Gruwell—Dow Chemical Company Physician

Dr. Dennis Gruwell is employed by Dow Chemical Company's Health Services. In May 2002 and July 2002, Dr. Gruwell contacted Dr. Falgoust regarding the plaintiff's medical condition. (R. 211, 215).

---

13. The April 29, 2003 visit (R. 132) seems to be primarily because of a sorethroat but the plaintiff's headache was also noted.

14. Dr. Falgoust also made reference to a January 7, 2005 office visit by the plaintiff. The letter states that the office notes were attached; however, the Court was unable to find this document in the record.

On September 16, 2002 Dr. Gruwell indicated that Dow could not accommodate the plaintiff's restrictions for work and that there was no other job available that could accommodate the restrictions. (R. 251).

On February 28, 2003, Dr. Gruwell summarized the plaintiff's medical history as headaches beginning when the plaintiff was 7 or 8 years old and worsening over time to the point where she now had headaches several days out of the week. (R. 158). Dr. Gruwell concluded that the plaintiff could not perform her job at Dow. He stated that "currently she is clearly unable to perform her usual and customary job. I also feel she is not able to perform any job at the present time." (R. 159).

### 3. Dr. William Gilbreath—River West Medical Center

On July 11, 2002 the plaintiff went the River West Medical Center Emergency Room. (R. 239, 237). The plaintiff complained of chronic headaches to the left side for six days and nausea. The plaintiff was also bothered by light. The plaintiff was referred to Dr. Falgoust for follow-up treatment. (R. 242).

### 4. Dr. Steven J. Cavalier—Neurology

On August 2, 2002, the plaintiff saw Dr. Steven Cavalier. (R. 196). Dr. Cavalier concluded that the plaintiff experienced headaches that could last for days at a time. She currently used Zomig, Maxalt, and Imitrex. She had tried cervical epidural steroid injections, allergy shots, physical therapy, chiropractic manipulation, preventative medications, and carpal tunnel surgery. (R. 196).

Dr. Cavalier concluded that the plaintiff's "neurological examination is normal, with the exception of severe cervical spasm

and decreased range of motion of the cervical spine." He diagnosed the plaintiff as having "a combination of migraine syndrome and severe chronic cervical spasm." (R. 197).

### 5. Dr. Joseph J. Jares, III—Independent Physician Consultant

After the plaintiff's appeal of MetLife's denial of Phase I disability benefits, MetLife forwarded the plaintiff's medical records to Dr. Jares. Dr. Jares did not examine the plaintiff.

In his January 2003 [15] report, Dr. Jares summarized the records of Drs. Falgoust and Cavalier. Dr. Jares concluded that "based on the medical records, from a neurology perspective, Ms. Adams does have impairment due to objective findings. The objective abnormalities include the mild degenerative change noted on the cervical and lumbrosacral spine." Dr. Jares noted that "as to reports of pain, photophobia, and nausea, these are subjective phenomena and cannot be quantified. The objective findings do not support a condition so severe as to preclude Ms. Adams from her usual occupation." (R. 167).

Dr. Jares was also called upon by MetLife to answer specific questions regarding whether the medical records supported a physical condition that would cause the plaintiff's impairment from May 2002. Dr. Jares concluded that the "records do no support a condition which would preclude employment from 05/05/02 through the present." (R. 167). Dr. Jares stated that there were "no neurological deficit or findings to corroborate with the abnormalities noted in the cervical spine. In regard to her headache complaints, the experience of

---

**15.** R. 171–176 (report dated January 28, 2003); *cf.* R. 165–170 (identical report dated January 29, 2003).

pain is a purely subjective phenomena and cannot be quantified." (R. 168).

### 6. Dr. Carl Scherer—Radiology Consultation

In June 2002, Dr. Scherer evaluated MRIs of the plaintiff's cervical spine and lumbar spine. (R. 194–95, 229–30). With regard to the cervical spine, Dr. Scherer concluded that the plaintiff had multilevel degenerative disk disease with minimal progression since the last exam in 2000. (R. 194, 230). With regard to the lumbar spine, Dr. Scherer found mild multilevel disk desiccation without disc bulge, herniation, or protrusion. (R. 195, 229).

In July 2004, MRIs of the plaintiff's right shoulder and cervical spine were taken. Although the impressions are largely illegible, Dr. Scherer found the supraspinatus tendon to be suggestive of tendonitis in the plaintiff's right shoulder. (R. 74). In the cervical spine multilevel degenerative disk disease was noted with a mild progression since the plaintiff's prior exam. (R. 75).

### 7. Dr. Alan C. Farries—Orthopedic Surgeon

On or about September 10, 2004, the plaintiff was examined by Dr. Farries. (R. 76). Dr. Farries noted that the plaintiff's biggest problem appeared to be neck pain. He found that the MRI reports indicated mild tendinitis in the rotator cuff, but he did not believe that problem was causing any of her present complaints. Dr. Farries concluded that "most of her problems are coming from her cervical spine where she does have several levels of disc bulging particularly involving the right foramen at C5–6." (R. 76).

### 8. Dr. Arousiak Varpetian—Independent Physician Consultant

After the plaintiff appealed the denial of Phase II benefits, MetLife submitted the plaintiff's file to Dr. Arousiak Varpetian. Dr. Varpetian did not examine the plaintiff. After reviewing the medical records, Dr. Varpetian concluded that there was "no objective finding to support any neurological impairment. Headaches are subjective complaints. The reported decreased ability to function is only during episodes of subjective headache. Her limitations are self-reported and change according to the severity of headaches. There are no safety issues that may cause restrictions." (R. 43).

Dr. Varpetian was asked by MetLife about the plaintiff's current level of functionality. Dr. Varpetian concluded that "from a neurology perspective, Ms. Adams has full function given her diagnosis." (R. 43).

### D. Phase I—Long Term Disability

Dow filed a Disability Claim Employer Statement with MetLife for Long Term Disability benefits for the plaintiff. (R. 270). The claim, dated May 28, 2002, stated that the plaintiff ceased working in May 2002. The Attending Physician Statement completed by Dr. Gerard Falgoust and dated June 26, 2002 listed the plaintiff's diagnosis as chronic migraine headaches and degenerative disc disease. (R. 267–68). Dr. Falgoust concluded that because of the plaintiff's severe migraines and photophobia it was unsafe for her to "climb, work at heights or be in [an] environment where she is stressed or exposed to sunlight." (R. 268). Dr. Falgoust advised that the plaintiff was not to return to work at Dow or any other occupation. (R. 268).

In the Disability Claim Employment Statement, the plaintiff stated that she suffered from severe migraines that prevented her from functioning in any capacity. The plaintiff explained that the headaches occurred randomly and would strike her at any time. The plaintiff stated that

these episodes could last for hours or days and would leave her very weak and drained. (R. 252).

### 1. Phase I Disability—MetLife's Denial

MetLife forwarded the Diary Review Report to a Nurse Consultant, M. Truchon Jones, and requested comments on the plaintiff's medical records. (R. 26). On November 8, 2002, Jones concluded that the "medical does not appear to show continued severity or symptoms to preclude work." (R. 26).

On November 18, 2002, MetLife issued a letter denying the plaintiff's claim for long term disability benefits. (R. 200–203). The company noted that "objective medical evidence is required to substantiate the existence of a disabling condition as defined by your plan" (R. 200). MetLife determined that "the submitted records do not support the severity of a condition that would prevent [the plaintiff] from performing [her] regular job or any other reasonably appropriate job Dow can provide." (R. 202). MetLife found the following deficiencies: 1) the medical evidence did not indicate the continued severity of symptoms that would preclude the plaintiff from work; 2) the medical evidence did not indicate the plaintiff's present medical status; 3) the documentation did not indicate the duration or severity of the headaches; 4) no documentation as to whether the medication prescribed on August 2, 2002 was effective; and 5) no office notes from Dr. Falgoust beyond July 2002 and no office notes from Dr. Cavalier after August 2002. (R. 202).

### 2. Phase I Disability—The Plaintiff's Appeal

After MetLife denied the plaintiff's claims, the plaintiff appealed the decision and sent a letter dated December 11, 2002,

opposing the decision. (R. 182). The plaintiff explained that she had suffered from migraines throughout her life and that she had undergone an extensive amount of treatment and had taken numerous medications to alleviate her condition. (R. 182). Prior to working at Dow, the plaintiff was a hairstylist. (R. 183). She noted that her job was difficult because when working on her clients she could not "even stand up straight, see across to the mirror, or hear anything above the ringing and pain in my head, neck, shoulders, right arm, and back." (R. 183). The plaintiff explained that there were days that she could not get out of bed and that light, sound, noise, and heat were her four worst enemies. (R. 184). With respect to her ability to work, the plaintiff stated that "I cannot commit to a job on a certain day and time because I never know when I will be released from pain. It's not only the pain; I cannot function, mentally or physically with it. I cannot concentrate on the matter at hand nor perform a task when I am unstable or vomiting. I never know what the day has in store for me . . ." (R. 185).

### 3. Phase I Disability—MetLife's Consideration and Denial of Appeal

The plaintiff's case file was referred to Dr. Joseph Jares, III. On January 28, 2003, Dr. Jares issued a report. (R. 171–175).[16] Among Dr. Jares' conclusions were that "based on the medical records, from a neurology perspective, Ms. Adams does have impairment due to objective findings." Dr. Jares stated that "as to the reports of pain, photophobia, and nausea, these are subjective phenomena and cannot be quantified. The objective findings do not support a condition so severe as to

---

**16.** *cf.* R. 165–171 (dated January 29, 2003).

preclude Ms. Adams from her usual occupation." (R. 167).

Dr. Jares concluded that Adams could work in a full-time seated sedentary position with a twenty pound lifting capacity. (R. 167). Dr. Jares' evaluation was based upon review of the medical records and he did not physically examine the plaintiff. (R. 170).

On January 30, 2003, MetLife issued a letter upholding its original decision on appeal. (R. 162–64). MetLife relied on Dr. Jares' report and his observations that "in regard to [Adam's] headache complaints, the experience of pain is a purely subjective phenomena and cannot be quantified." (R. 163). The plaintiff was advised that she had exhausted her administrative remedies under the plan and no further appeals would be considered. (R. 164).

#### 4. Phase I Disability—MetLife's Approval of LTD benefits

On February 28, 2003, Dr. Dennis Gruwell of Dow Health Services wrote to MetLife regarding the plaintiff. Dr. Gruwell briefly summarized the plaintiff's medical history as headaches that began when she was 7 or 8 years old and continued to persist. Dr. Gruwell noted that over the past few years the headaches had worsened and occur several days out of each week. The plaintiff visited Dr. Falgoust monthly for Zomig injections for temporary relief. (R. 158). The plaintiff also "sees Dr. Cavalier, a neurologist, every three months, but he admits he has nothing more to offer her." (R. 159).

Dr. Gruwell summarized his conclusions as follows:

Ms. Adams has been employed by Dow as an operator in the Power 1 and 2 plants. This is very physical work, opening and closing valves, manipulating 55 gallon drums of oil, climbing multiple stairs and vertical ladders. When asked how she functioned for ten years, she admits that co-workers helped her survive. She is required to work rotating shifts and hot summer days in the sun.

In my opinion, Ms. Adams cannot perform her usual and customary job as an operator in the Power 1 or 2 plants. I do not feel she could work an inside board job, because she states when she gets a migraine headache she cannot think straight. She also requires multiple medications that would interfere with her ability to do safety sensitive work in the plant. Given her current daily activity log, I do not feel she could even do a simple clerical job.

Currently she is clearly unable to perform her usual and customary job. I also feel she is not able to perform any job at the present time.

(R. 159).

On March 6, 2003, MetLife issued a letter approving the plaintiff's claim for Long Term Disability benefits. (R. 156). The letter stated in part that:

According to your employer's Long Term Disability plan, during the six month waiting period and the first 24 months when LTD benefits become payable, "total" disability is: an illness or injury that prevents you from performing your regular work or any other reasonably appropriate work Dow can provide.

Furthermore, as of February 28, 2005 you will be considered totally disabled only if you are, after the first 30 months, totally disabled from working for compensation or profit at any work for which you are reasonably fitted by education, training, or experience. This means work within Dow or elsewhere.

(R. 156).

#### E. Social Security Benefits

In 2003, MetLife sent several letters to the plaintiff advising her that she may be

eligible for Social Security Disability Insurance (SSDI) benefits. (R. 141–42, 127). The plaintiff was further advised that her failure to apply for SSDI benefits or her failure to pursue all appeals could result in the reduction of her long-term disability benefits under the Plan. (R. 142).

The plaintiff informed MetLife that her SSDI claim had been denied. (R. 143–155). The Social Security Administration determined that "we realize that your condition prevents you from doing any of your past work, but it does not prevent you from doing work which requires less physical effort and avoids height and dangerous machinery. Based on your age (44), education (12), and past work experience, you can do other work." (R. 146).

The plaintiff appealed the Social Security Administration's decision. (R. 120). The appeal was successful and on October 31, 2003, the Social Security Administration found that the plaintiff became disabled under their rules on May 7, 2002 and that the plaintiff was entitled to monthly benefits beginning November 2002. (R. 104–06).

MetLife requested and received reimbursement for the overpayment of the plaintiff's Long Term Disability Claim as a result of her award of SSDI benefits. (R. 103, 108–09).

### F. Phase II Disability

#### 1. Phase II Disability—MetLife's Investigation

As part of MetLife's ongoing evaluation of the plaintiff's claim, additional medical records were requested. (R. 138). MetLife forwarded the file to L. Robertson, a Certified Rehabilitation Consultant. A July 18, 2003 Diary Review Report entry indicates that Robertson lacked information necessary to do the analysis. Robertson states that the "current medical appears to preclude sustainable work in any capacity." Robertson requested that if any "additional or alternate current medical data is available which specifies sustainable work capacity, please forward to my [attention]." (R. 14).

On February 12, 2004, a Nurse Consultant conducted a telephone interview of the plaintiff. (R. 10–11). The plaintiff explained that she has had headaches since childhood but they have increased in severity and frequency precluding her ability to work. The Nurse Consultant found the plaintiff's voice to be "jittery" and found that the "plaintiff voiced hopelessness about her condition." (R. 11). The Nurse Consultant recommended that: "SIU" (special investigations unit-surveillance) be conducted to determine if the plaintiff's activities were consistent with her interview; updated medical records be requested; and that the plaintiff's physician be asked if the plaintiff would benefit from referral to a mental health professional "as underlying psychological condition may be contributing to her symptoms." (R. 10).

On March 17, 2004, NWI Investigative Group attempted to obtain surveillance video of the plaintiff. However, the investigation was terminated after determining that the plaintiff's whereabouts were unknown. (R. 93–97).

In response to various record requests by MetLife, Dr. Falgoust sent a letter dated May 13, 2004 in which he stated that the plaintiff was unemployable, especially from her current job. Dr. Falgoust also submitted a Statement of Functional Capacity dated June 2, 2004, in which he concluded that the plaintiff was unimproved, had severe daily headaches, and could not return to her occupation or any other occupation. (R. 89, 82–83).

A December 21, 2004 Diary Review Report entry details a rehabilitation review by K. James, a Rehabilitation Consultant. (R. 7). James stated that "it appears that [Adams] may have functional capacity for

light work but needs to avoid e[n]vironmental exposures that would aggravate severe headaches, and frequency and severity of headaches may compromise employability for [any occupation] [due to] issues related to lost time from work." James concluded that it "is likely that [the Adam's] condition will need to be improved by better control of headaches for [return to work] potential." (R. 7). On January 20, 2005, James noted that he was unable to complete the work up, that medical documentation had been requested, and that follow-up was to be done by a Nurse Consultant. (R. 7).

Additional medical records were forwarded by Dr. Falgoust. (R. 71–76, 65–70). On February 22, 2005, a Nurse Consultant concluded that there was no current medical documentation in the file to support a functional impairment that would prevent the plaintiff from functional activities "as we have no current [information] regarding severity, frequency of headaches if [Adams] still has them at all." (R. 6). The Nurse Consultant found that there was "no documentation if [Adams] has been seen by any [doctors] for her headaches or symptoms, what her current [restrictions and limitations], what are her current symptoms [that] are preventing [return to work] at this time such as nausea, vomiting, [weight] loss, headaches, symptoms of any mental health [diagnosis]." (R. 6).

### 2. Phase II Disability—MetLife's Denial

On March 4, 2005, MetLife adopted the findings of the Nurse Consultant and issued a letter informing the plaintiff that she no longer met the criteria set forth in her Plan. (R. 59–61). The letter stated that MetLife had reviewed the plaintiff's claim including: 1) a May 13, 2004 letter from Dr. Falgoust; 2) a June 4, 2004 Physical Capacity [form] completed by Dr. Falgoust; 3) Office Notes from Dr. Fal-

goust dated June 24, 2004 and September 10, 2004; and 4) MRI's of the right shoulder and cervical spine dated July 7, 2004. The letter noted that a June 24, 2004 office note was not legible. (R. 60).

Specifically, MetLife determined that:

Based on the medical information in your file, medical does not support an inability to function in any type of occupation. Information lacking from your file includes current medical documentation from September 2004 though [sic] the present showing the severity and frequency of your headaches and if any doctors are still treating you for your headaches and/or symptoms. We have no information as to what your current restrictions and limitations [are] and we have no documentation of current symptoms that are preventing you from returning to work. Therefore, because you do not meet the definition of disability for Phase II of the Dow Chemical Company long-term disability plan, long term disability benefits will terminate effective February 28, 2005.

(R. 61).

### 3. Phase II Disability—Request for Reconsideration and Appeal

On March 22, 2005 Dr. Falgoust wrote to MetLife to voice his objection to the denial of the plaintiff's long term disability benefits. (R. 57–58). He summarized a June 24, 2004 office visit that MetLife claimed was illegible and he concluded that MetLife's referral to a June 10, 2004 visit to his office was in error. Dr. Falgoust also stated that MetLife had not considered a January 7, 2005 office visit by the plaintiff. (R. 58).

Dr. Falgoust concluded that "Bridget Adams is totally and permanently disabled for any occupation, in my opinion, and your denial of disability should be reversed due

to the erroneous (and perhaps intentionally biased) bases of your decision." (R. 58).

On April 23, 2005, the plaintiff requested an appeal of the denial of her long term disability benefits. (R. 53–55).[17] In her letter, the plaintiff asserted that she has suffered from migraines throughout her life and she cannot recall a time that she had not endured the chronic headaches. (R. 53–54). The plaintiff explained that she has taken numerous prescription and over-the-counter drugs in order to alleviate her pain, but to no avail. (R. 54). Consequently, the daily, severe headaches leave her body weak from the pain. (R. 53–55). The plaintiff stated that "I cannot do my past job or any other jobs due to my illnesses with the enormous amount of pain that has been and is still inflicted on my body daily." (R. 53).

### 4. Phase II Disability—MetLife's Consideration and Denial of Appeal

MetLife referred the plaintiff's file to an independent physician consultant for review. The report dated June 1, 2005 by Dr. Arousiak Varpetian concluded that "there is no objective finding to support any neurological impairment. Headaches are subjective complaints. The reported decreased ability to function is only during episodes of subjective headache. Her limitations are self-reported and change according to the severity of headaches. There are no safety issues that may cause restrictions." (R. 43). Dr. Varpetian's evaluation was based on reviewing the medical records and the doctor did not examine the patient. (R. 46).

On June 4, 2005, MetLife issued a letter upholding its decision to terminate the plaintiff's benefits. (R. 38–40). MetLife

adopted the findings of the Independent Physician Consultant and concluded that there was no objective evidence to support any neurological impairment. MetLife stated that "review of the information that has been submitted on appeal along with the information on record does not indicate a functional impairment severe enough to prevent you from performing your regular job for which you are reasonably fit by your education, training or experience." (R. 40).

## II. Conclusions of Law

### A) Jurisdiction

This matter involves a claim for disability benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. As such, this court has federal question jurisdiction under 29 U.S.C. § 1132(e)(1).

### B) Standard of Review

#### 1. Appropriate Standard

The Fifth Circuit has held that when "a plan grants the administrator discretionary authority to determine claims for benefits, claimants may recover under ERISA only if the administrator's rejection of their claim was an abuse of discretion." *Robinson v. Aetna Life Ins. Co.,* 443 F.3d 389, 395 (5th Cir.2006). In this case, the Plan at issue grants the Plan administrator "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."[18] Accordingly, review for abuse of discretion is appropriate.

---

**17.** It appears that the defendant's Trial Brief mistakenly lists the date of the formal appeal as May 23, 2005 (doc. 20, p. 17).

**18.** Doc. 15 (Your Employee Benefit Plan, unnumbered page section captioned "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries").

In the context of ERISA, the abuse of discretion standard of review is equivalent to an "arbitrary and capricious" standard. *Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F.Supp.2d 724, 731 (S.D.Tex. 2005). A decision is arbitrary if it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 828 (5th Cir. 1996). Furthermore, an administrator must have "substantial evidence" to support its decision to deny or terminate benefits. *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 274 (5th Cir.2004). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 273 (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir.1986)).

### 2. Conflicts of Interest

Federal courts "owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment." *Pierre v. Connecticut Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir.1991). However, less deference is owed to an administrator's decision when a plaintiff demonstrates that the plan fiduciary is not completely impartial and has a conflict of interest.

Whether an administrator decided a claim when conflicted is a "relevant factor" and if the administrator is conflicted, courts "will give less deference to the administrator's decision." *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 299 (5th Cir.1999). When an administrator has a conflict of interest, courts will be "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Id.*

In this case, the plaintiff has alleged that a conflict of interest exists because MetLife is both the administrator of the plan and insurer of the plan. The Court agrees. At least a "minimal conflict exists when the plan fiduciary is a third party that both insurers and administers the plan." *Robinson*, 443 F.3d at 395; *Gellerman*, 376 F.Supp.2d at 733. Therefore, the Court must apply a "sliding scale" standard and give less deference to the administrator's decision. *Vega*, 188 F.3d at 298–99. Under this sliding scale, the "greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id.* at 297. The plaintiff, however, has presented no evidence regarding the extent or degree of the of the conflict. In this circumstance, the Court will review the decision of the administrator "with only a modicum less deference than [it] otherwise would." *Id.* at 301.

### 3. Application of the Standard

The plaintiff urges this Court to adopt a two-step test in which the Court would first determine whether the interpretation the defendant gave to the Plan's terms was legally correct and then if the interpretation is incorrect, the Court would determine whether the defendant's interpretation was an abuse of discretion.

The Court acknowledges that the application of the abuse of discretion standard usually involves the two-step process outlined by the plaintiff. However, when a case does not involve sophisticated Plan interpretation issues, "the reviewing court is not rigidly confined to this two-step analysis." *Gellerman*, 376 F.Supp.2d at 731. In this case, MetLife's decision that Adams is not disabled as defined by the Plan is a factual determination subject to review by this Court under an abuse of discretion standard. *See Stone v. Pruden-*

tial Ins. Co. of Am., 226 F.Supp.2d 818, 822 (W.D.La.2002). Therefore, the two-step inquiry is not necessary.

■ Finally, the Court notes that "when assessing factual questions, the district court is constrained to the evidence before the plan administrator." Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 394 (5th Cir.2006).

Accordingly, the Court will evaluate MetLife's decision under an abuse of discretion standard with a modicum of less deference and the Court will limit its review to the evidence before the plan administrator.

## C) Whether MetLife Acted Arbitrarily and Capriciously

### 1. Social Security Disability Determination

The plaintiff argues that a ruling by the Social Security Administration (SSA) awarding the claimant disability benefits is relevant to the determination of long term disability benefits under the Plan. The plaintiff asserts that the SSA award should have been acknowledged and analyzed by the ERISA administrator.[19]

■ This court agrees with the plaintiff. Although Social Security determinations are not binding upon a plan administrator, they are "relevant and instructive" in a Court's determination of whether a plan administrator acted arbitrarily and capriciously. Gellerman, 376 F.Supp.2d at 735 (noting that "no court has held that an SSA determination is completely irrelevant"); White v. Airline Pilots Assoc., 364 F.Supp.2d 747, 767 (N.D.Ill.2005) (finding that SSA decisions are "relevant and instructive"); De Dios Cortes v. MetLife, Inc., 122 F.Supp.2d 121, 130 (D.P.R.2000) (concluding that a SSA award of benefits is "highly material").

In Glenn v. MetLife, 461 F.3d 660, 666–67 (6th Cir.2006), the Sixth Circuit found that a district court had given "inadequate consideration" to the Social Security Award Determination of disability. In that case, MetLife encouraged the plaintiff to apply for SSA benefits and then deducted the amount of those benefits from its payment obligations once SSDI benefits were awarded. Yet, in deciding to terminate payments under the MetLife policy, "the plan administrator gave no weight [whatsoever] to the Social Security Administration's determination of total disability." Id. at 667.

The Glenn Court concluded that the plan administrator reaped a dual victory. First, the SSA's determination of disability reduced the plaintiff's claim against the employee welfare plan. Then, the plan administrator reaped a second victory by denying that the plaintiff was disabled under its plan. Id. at 667–68. Although the Court declined to apply the doctrine of judicial estoppel, it found that the inconsistent positions should be taken into account. The Glenn Court concluded that "having benefitted financially from the government's determination that Glenn was totally disabled, MetLife obviously should have given appropriate weight to that determination." The Court further noted that "an ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was 'totally disabled' is yet another factor that can render the denial of further long-term disability benefits arbitrary and capricious." Id. at 669.

In the present case, the record reflects that MetLife was aware of Adam's Social Security Disability Award and that MetLife encouraged her to apply for Social Security Disability Insurance (SSDI) benefits. Following the plaintiff's successful

---

**19.** Doc. 17 (Plaintiff's Trial Brief, p. 12).

appeal of the SSA's original determination and her award of SSDI benefits, MetLife requested and received reimbursement from the plaintiff for its overpayment of long term disability benefits.

In reviewing the March 4, 2005 denial letter and June 4, 2005 appeal review letter, this Court found no mention of the SSA benefits awarded to Adams. An SSA determination of disability is made by an impartial administrative law judge. The judge must be satisfied that the claimant suffers from a severe impairment and in light of the claimant's age, education, and work experience, she cannot make an adjustment to any other work. *See* 20 C.F.R. § 416.920.

In the March 2005 letter Adam's claim was purportedly denied because the "medical does not support an inability to function in any type of occupation." In the June 2005 letter which affirmed the March decision, MetLife relied on Dr. Varpetian's conclusion that "there is no objective finding to support any neurological impairment." However, the report by Dr. Varpetian made no mention of the SSA determination. An SSA determination of disability is particularly pertinent here as it is a conclusion by an administrative agency that objective support exists for a treating physician's opinion. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir.2005). Because Dr. Varpetian did not mention or cite to the SSA's findings, a question exists as to whether Dr. Varpetian was aware of the SSA award. *See id.* at 296 (concluding that a physician who did "not mention the SSA disability determination at all, even to discount or disagree with it [...] indicates that he may not even have been aware of it").

This court reiterates that an SSA determination of disability is not dispositive of a disability determination under an ERISA plan. However, it is highly relevant. Therefore, this Court will consider the following factors in its determination of whether the plan administrator acted arbitrarily and capriciously. First, that an impartial administrative agency concluded that the plaintiff was totally disabled for any occupation. Second, that neither MetLife nor Dr. Varpetian addressed the administrative agency's determination in its denial.

## 2. Medical Evidence

### Treating Physician

The plaintiff asserts that MetLife acted arbitrarily in terminating her disability benefits because her disability was well documented in the administrative record. Among other things, the plaintiff points to MRIs showing tendonitis and disc disease and the statements and findings of Dr. Falgoust that the plaintiff suffered from chronic headaches and was unable to return to any occupation.

The defendant asserts that it was not required to defer to the decision of Adams' treating physician. The plaintiff's record was referred to an independent physician consultant and the defendant argues that it is entitled to choose between conflicting medical opinions.

This Court agrees with the defendant's argument. The Supreme Court has stated that courts cannot require plan administrators to automatically accord special weight to the opinions of a claimant's physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). *See also Stone v. Prudential Ins. Co. of Am.*, 226 F.Supp.2d 818, 825 (W.D.La.2002) (stating that there is "no treating physician preference in the ERISA context and an administrator does not act arbitrarily when it bases its decision to deny benefits on the opinions of independent physicians who disagree with those of the beneficiary's physicians").

■ However, although plan administrators can choose between conflicting opinions, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834, 123 S.Ct. 1965. Therefore, a plan administrator must consider all of the evidence before it.

### File Review

The plaintiff cites several cases for the proposition that if the plan administrator "does not interview the client and does not send her for an independent medical assessment, there is no evidence in the record to contradict a treating physician's opinions about the nature and extent of the claimant's impairments." In rebuttal, the defendant cites *Gooden v. Provident Life & Accident Ins., Co.*, 250 F.3d 329 (5th Cir.2001). In *Gooden*, the Fifth Circuit held that the plan administrator did not abuse its discretion by relying upon the assessment of a physician who had not examined the plaintiff. *Id.* at 335.

■ This Court agrees with the defendant; a plan administrator's decision to have an independent physician to conduct a file review rather than a physical examination is not *per se* arbitrary. However, the Court takes note of the fact that this case does not fit squarely into the *Gooden* mold. In *Gooden*, the medical consultant stated that the plaintiff's condition (angina and coronary artery disease) could be verified from the objective medical information. *Id.* In the present case, however, Dr. Varpetian concluded that "headaches are subjective complaints." *See also Audino v. Raytheon Co. Short Term Disability Plan*, 129 Fed.Appx. 882, 885 (5th Cir. 2005) (recognizing that pain cannot always be objectively quantified).

Accordingly, as this case involves subjective accounts, the fact that only a file review was conducted is relevant. Therefore, this Court will take into consideration

that the plaintiff was never examined by the independent physician consultant. *See Calvert*, 409 F.3d at 296–297 (taking into account that the physician who concluded that the plaintiff's claims of subjective pain were not credible had never met or examined the plaintiff).

*The Initial Denial of Phase II benefits—March 4, 2005 letter*

It its initial denial of Phase II benefits, MetLife concluded that the "medical does not support an inability to function in any type of occupation" (R. 61). The letter explained that:

> Information lacking from your file includes current medical documentation from September 2004 though (sic) the present showing the severity and frequency of your headaches and if any doctors are still treating you for your headaches and/or symptoms. We have no information as to what your current restrictions and limitations are and we have no documentation of current symptoms that are preventing you from returning to work.

(R. 61).

The Court finds MetLife's initial decision curious. The crux of MetLife's argument at this stage is a lack of medical documentation. However, the record is replete with such evidence. As previously mentioned, a strong indicator of the plaintiff's condition was an October 31, 2003 determination by the Social Security Administration that the plaintiff was disabled and unable to make an adjustment to other work. Moreover, the plaintiff sought medical attention throughout 2002, 2003, and 2004 and on virtually every occasion the plaintiff's severe, daily headaches were documented. *See, e.g.*, R. 267–268 (June 26, 2002) (prognosis that the plaintiff could not return to her present job or any other occupation); R. 211 (July 31, 2002) (same); R. 133 (May 27, 2003) (noting chronic

headaches and arm and shoulder pain); R. 129 (July 2003) (stating that the plaintiff's headaches were "chronic unremitting"; "daily, daylong"; 8–9 intensity on a scale of 10 and worsened by activity or sunlight); R. 66 (January 7, 2004) (noting chronic migraines); R. 99 (April 2, 2004) (finding continued severe disabling headaches); R. 81 (May 13, 2004) (stating that the plaintiff suffers from "severe, chronic vascular headaches" that were "completely disabling" and that she was "unemployable"); R. 70 (June 4, 2004) (concluding that the plaintiff's condition was "unimproved" that she was disabled from any occupation and that she could "never" resume work activities); [20] R. 72 (June 24, 2004) (noting severe continuous pain from neck to top of toes on the right side); [21] R. 76 (September 10, 2004) (acknowledging the plaintiff's long history of neck and shoulder pain and chronic headaches and concluding that her mild tendonitis is not the cause of her complaints).[22]

Defendant's decision that no information existed as to the plaintiff's current condition is questionable in light of the fact that virtually every medical visit from 2002 to 2004 noted her chronic, daily headaches, that her condition had not improved, that she was not fit for any work, and that she would never be fit for any work. Additionally, MetLife concluded that it had no in-

formation as to whether the plaintiff was still being treated from September 2004 through the present despite a September 10, 2004 evaluation (R. 76).[23]

*Affirming the Denial of Phase II benefits—June 4, 2005*

On June 4, 2005 MetLife issued a letter upholding the its original determination to terminate benefits. (R. 38–40). Relying upon an Independent Physician Consultant, MetLife concluded that the record "does not indicate a functional impairment severe enough to prevent you from performing your regular job or any other job for which you are reasonably fit by your education, training or experience." (R. 40).

The Court now turns to the report by Dr. Varpetian which MetLife's decision was based upon. Dr. Varpetian noted that Dr. Falgoust documented "severe daily headaches lasting all day accompanied with phonophobia, photophobia, and vomiting" as well as "right arm and shoulder pain and numbness." (R. 42–43). Dr. Varpetian acknowledged that Dr. Falgoust had concluded that the plaintiff was permanently disabled from working due to her migraines. (R. 43). Dr. Varpetian next summarized the findings of Dr. Gruwell who concluded that the plaintiff was un-

---

**20.** In its denial letter, MetLife stated that "Dr. Falgoust notes that you are totally disabled for your own occupation." This is true, but it is also an incomplete summary. More important is the fact that Dr. Falgoust also concluded that the plaintiff was totally disabled from "any" occupation. As the inquiry for a Phase II disability under the plan is a disability from *any* occupation, this Court wonders why MetLife would mischaracterize Dr. Falgoust's conclusions and leave off this relevant information.

**21.** MetLife discounted this office visit as "illegible" (R. 60). The Court agrees that some of the writing is hard to discern. However, the

Court takes note of the fact the record does not indicate that MetLife requested a translation of the notes before denying the plaintiff's claim.

**22.** In its denial letter, MetLife incorrectly attributes this document to Dr. Falgoust. However, the document was created by Dr. Alan Farries.

**23.** In his March 22, 2005 letter Dr. Falgoust also refers to a January 2005 visit that MetLife failed to consider and states that it is attached (R. 58). This attachment was not found in the administrative record.

able to perform any job due to her migraines. (R. 43).

Dr. Varpetian stated that Dr. Cavalier diagnosed the plaintiff with "migraine syndrome and severe chronic cervical spasm" and that Dr. Fames described "neck pain radiating to the right arm and a cervical C5–C6 disc bulge limiting Ms. Adams' activity." (R. 43). Dr. Varpetian also summarized the MRI of the plaintiff's lumbar and cervical spine in 2002 which showed "minimal disc desiccation without any bulge or herniation of the lumbar spine and multilevel degenerative disc disease . . ." (R. 43). Of the July 2004 MRI of the right shoulder Dr. Varpetian found it to be illegible but stated "there seems to be a notation of tendonitis." Of the July 2004 MRI of the cervical spine, Dr. Varpetian summarized the findings as showing "multilevel disc disease." (R. 43).

Dr. Varpetian concluded that:

> There is no objective finding to support any neurological impairment. Headaches are subjective complaints. The reported decreased ability to function is only during episodes of subjective headache. [Ms. Adam's] limitations are self-reported and change according to the severity of the headaches. There are no safety issues that may cause restrictions.

(R. 43).

Dr. Varpetian further concluded that "from a neurology perspective, Ms. Adams has full function given her diagnosis." (R. 43).

The plaintiff asserts that MetLife improperly "rejected [her] complaints of pain and her description of her limitations even though [ . . . ] no one has questioned her [credibility] or pointed out any inconsistencies between her reports and the objective findings." The plaintiff argues that "there is no justification for ignoring this evi-

dence."[24] The defendant does not address why it ignored the plaintiff's subjective accounts either in the record or in its briefing to the Court. It appears that MetLife's defense is that it is entitled to choose between conflicting medical opinions and that it gave the plaintiff's file and full and fair review.

■ As previously discussed, the defendant does not have to give preference to the treating physician and can disagree with the treating and other physicians. However, as the Supreme Court has stated, the corollary to that rule is that a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834, 123 S.Ct. 1965. A plethora of cases have held that subjective evidence cannot be discounted solely because it is subjective. Accordingly, MetLife's wholesale ignorance of the plaintiff's subjective complaints was in error.

MetLife stated that "objective evidence is not present" to support the plaintiff's claims of chronic headaches yet this conclusion was reached despite the documentation by Dr. Falgoust, Dr. Gruwell, and Dr. Cavalier concluding that the plaintiff suffered from severe disabling headaches.

The determination by MetLife in this case is eerily similar to the plan administrator's denial in *Glenn v. MetLife*, 461 F.3d 660 (6th Cir.2006). In *Glenn*, the treating physician repeatedly referred to stress as a factor in the plaintiff's condition. Nevertheless, MetLife denied disability benefits stating that "there is no supportive medical documentation of the exacerbation of your cardiac condition and symptomology, due to the subjective complaints of work-related stress." *Id.* at 672. The Court concluded that the plan admin-

---

24. Doc. 17 (Plaintiff's Trial Brief, p. 16).

istrator's rejection of the treating physician's assessment was arbitrary because "the plan itself [did] not restrict the type of evidence that may be used to demonstrate total disability." *Id.* at 673. The *Glenn* Court further admonished MetLife for relying on an independent physician review that disregarded the plaintiff's stress as entirely self-reported. *Id.* The Court noted that the plan did not say that self-reported or "subjective" factors should be accorded less significance so it was "unreasonable for MetLife to have dismissed stress as an improperly documented, subjective, and irrelevant factor in its disability determination." *Id.*

Other courts are in accord with *Glenn* and have held that subjective accounts cannot be summarily dismissed. In *May v. Metropolitan Life Ins. Co.*, No. 03–5056, 2004 WL 2011460, *7 (N.D.Cal. Sept. 9, 2004), the court held that the plan administrator abused its discretion by requiring the plaintiff to meet an additional requirement of providing "objective" evidence. The court stated that a plan administrator "cannot exclude a claim for lack of objective medical evidence unless the objective medical evidence standard was made clear, plain and conspicuous enough in the policy to negate plaintiff's objectively reasonable expectation of coverage." (quoting *Duncan v. Cont'l Cas. Co.*, No. 96–2421, 1997 WL 88374, *4 (N.D.Cal. Feb. 10, 1997)).

Still other courts have concluded that accounts of pain cannot be ignored. *See Audino v. Raytheon Co. Short Term Disability Plan*, 129 Fed.Appx. 882, 885 (5th Cir.2005). In *Audino*, the Fifth Circuit court was "troubled by MetLife's failure to accord weight to Audino's consistent complaints of pain, even though those complaints were documented in her medical records for years before she sought benefits and there is no indication that she overstated her pain once she decided to seek benefits." The Court stated that

"[w]e have recognized that pain cannot always be objectively quantified and have faulted an administrator for 'focu[sing] on [ ] tests, rather than the pain and its effect'." *Id.* (quoting *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 347 (5th Cir.2002)).

Likewise in *Gellerman*, 376 F.Supp.2d at 734, fn. 9, the court stated that the defendants could not discount the plaintiff's pain. The *Gellerman* court explained that "defendants are not free to ignore the plaintiff's chronic and severe pain under the apparent theory that MRIs or EMGs must demonstrate some structural deformity for a person to be disabled because of back pain. Unfortunately for all parties involved, back pain, even severe pain, is not so simple." *Id. See also Pollini v. Raytheon Disability Employee Trust*, 54 F.Supp.2d 54, 59–60 (D.Mass.1999) (finding that "even though subjective evidence is arguably less dependable than objective evidence, a doctor's assessment of pain is not insignificant medical testimony" and concluding that it was "unreasonable to ignore the assessments of pain made by several trained medical professionals").

Finally, courts have held that a determination of disability by the Social Security Administration provides objective support. *See Calvert*, 409 F.3d at 294 (concluding that an SSA determination provides support for the conclusion that an administrative agency charged with examining the plaintiff's medical records found objective support for the treating physician's opinion in those records). *See also Evans v. UnumProvident Corp.*, 434 F.3d 866, 878 (6th Cir.2006). However, as discussed above, in the present case, MetLife did not address the SSA's determination of disability in its decision nor does Dr. Varpetian refer to or discuss the SSA determination in his report or in the list of documents he reviewed.

MetLife has not pointed to a provision in the Plan limiting the record in this case to objective data. As such, the plaintiff's subjective accounts and the assessments by her doctors should have been considered.

To be clear, the defendant was free to discredit the plaintiff's subjective complaints. Indeed, the defendant attempted to do so by conducting surveillance of the plaintiff. (R. 93–97). *See, e.g., Lacour v. Life Ins. Co. Of N. Am.,* 200 F.Supp.2d 622, 631 (W.D.La.2002) (upholding decision of plan administrator when independent surveillance suggested an active lifestyle and after court found no objective or subjective evidence of a disability). In this case, however, the surveillance uncovered nothing, and the defendant offers no basis to challenge the plaintiff's subjective accounts of her chronic headaches or the medical opinions that have documented her headaches. Unable to prove that the plaintiff is not suffering from disabling pain, MetLife appears to have resorted to another tactic, discounting the plaintiff's accounts of pain altogether.

MetLife's adoption of Dr. Varpetian's report (and the similar report by Dr. Jares) that discounts the plaintiff's headaches as "subjective complaints" was an abuse of discretion and not supported by substantial evidence. In fact, in reading Dr. Varpetian's report, not only did he conclude that the plaintiff is unable to meet the Phase II disability definition and can perform other work, but Dr. Varpetian also concluded that the plaintiff has "full function." MetLife's reliance on such conclusions despite the medical evidence detailed above is absurd.

■ In sum, the Court reviewed this case for an abuse of discretion, limiting itself to the administrative record, and viewing MetLife's decision with slightly less deference because MetLife has a conflict of interest. In light of the fact that

MetLife did not consider or evaluate the SSA determination of disability; conducted only a file review; found no medical documentation for the plaintiff's condition despite extensive medical documentation; and discounted the plaintiff's subjective complaints and her doctor's assessment of them based on the fact that headaches are subjective, this Court finds that MetLife acted arbitrarily and capriciously in denying the plaintiff's claims for Phase II benefits.

### D) Attorneys' Fees

■ The plaintiff seeks an award of attorneys' fees under ERISA. An award of attorneys' fees in an ERISA action is purely discretionary. 29 U.S.C. § 1132(g)(1); *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1016 (5th Cir.1992). In making the determination of whether a party is entitled to attorneys' fees under ERISA, the Court should first consider the five factors established in *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980).

The *Bowen* factors are: 1) the degree of the opposing parties' culpability or bad faith; 2) the ability of the opposing parties to satisfy an award of attorneys' fees; 3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; 4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and 5) the relative merits of the parties' positions. *Id.*

■ The defendant contends that the plaintiff failed to provide adequate evidence or argument to show entitlement to attorneys' fees. This Court disagrees. The arguments made by the parties in their briefings to the Court and the administra-

tive record provide sufficient justification for an award of attorneys' fees.

In the ruling above, this Court concluded that the defendant's decision was arbitrary and capricious in light of ERISA jurisprudence. The case law guiding this decision is clear and not in dispute. Therefore, the first and fifth *Bowen* factors weigh in favor of the plaintiff.

Additionally, consistent with the third factor, this Court is hopeful that an award of attorneys' fees will have a deterrence effect. The court is mindful of the fact that various defendants have been repeatedly admonished for abuse of discretion in similar cases.[25] However, this Court hopes that by awarding attorneys' fees and by adding its opinion to the chorus of other rulings, this ruling will not fall on deaf ears.

### *CONCLUSION*

For the reasons set forth above, the Court finds in favor of the plaintiff, Bridget Adams and against the defendant, Metropolitan Life Insurance Company (Met-Life).

MetLife is ordered to pay past Phase II long term disability benefits retroactive to March 1, 2005 to the present in the monthly amount specified in the Plan and subject to such offsets as are permitted in the Plan, plus pre-judgment interest. MetLife is further order to continue to make future long term disability benefits in the monthly amount specified in the Plan and subject to such offsets as are permitted in the Plan until such time as MetLife makes an adverse determination of Phase II disability consistent with ERISA and the plaintiff's entitlements under the Plan.

---

**25.** Unfortunately, this is not the first time that MetLife has received an adverse judgment for very similar conduct. *See, e.g., Glenn v. Met-Life*, 461 F.3d 660 (6th Cir.2006); *Audino v. Raytheon Co. Short Term Disability Plan*, 129

The plaintiff is entitled to costs and attorneys' fees. The plaintiff shall file a request for attorneys' fees with supporting documentation within 14 days from the date of this order. The defendant shall have 7 days after the plaintiff's filing to reply to the plaintiff's request for attorneys' fees.

It is so **ORDERED.**

Fed.Appx. 882 (5th Cir.2005); *May v. Metro. Life Ins. Co.*, No. 03–5056, 2004 WL 2011460 (N.D.Cal. Sept. 9, 2004); *Pollini v. Raytheon Disability Employee Trust*, 54 F.Supp.2d 54 (D.Mass.1999).